UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

STEVEN ROSEN,

      Plaintiff,

   v.

JO ANNE B. BARNHART,
Commissioner of Social
Security,

      Defendant.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 05-4259(JEI)

**OPINION**

**APPEARANCES:**

JACOBS, SCHWALBE & PETRUZZELLI, P.C.
BY: Robert A. Petruzzelli, Esq.
Woodcrest Pavilion
Ten Melrose Avenue - Suite 340
Cherry Hill, NJ 08003
    Attorney for Plaintiff

CHRISTOPHER CHRISTIE, UNITED STATES ATTORNEY
BY: Tomasina DiGrigoli, Esq.
Special Assistant U.S. Attorney
Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278-0004
    Attorney for Defendant

**IRENAS**, Senior District Judge:

    Steven Rosen ("Rosen") brings this action pursuant to

Section 205(g) of the Social Security Act ("Act"), 42 U.S.C.

§ 405(g) and Section 1634(c)(3) of the Act, 42 U.S.C.

1

§ 1383(c)(3), for review of the final determination of the
Commissioner of Social Security ("Commissioner") denying Rosen's
application for Social Security Disability Insurance Benefits.
For the reasons set forth below, this Court reverses the decision
of the Administrative Law Judge ("ALJ") dated August 19, 2004,
and remands this matter for further proceedings.

**I.**

The instant action arises from Rosen's application for
Disability Insurance Benefits filed on July 26, 2002.  (R. at 82-
84.)  Rosen asserted a disability onset date of May 13, 2002.
(R. at 82.)  His application was denied initially and upon
reconsideration.  (R. at 65, 70.)  Rosen then requested and
received a hearing before an ALJ, which was held on August 9,
2004, in Voorhees, New Jersey.  (R. at 17, 73.)  Rosen was
represented by counsel at that proceeding.  (R. at 36.)  ALJ
Irving A. Pianin determined that Rosen was not disabled under the
Social Security Act, in an opinion dated August 19, 2004.[1]  (R.
at 27 ¶ 13, 28.)

Rosen then sought review of the ALJ's decision by the Social
Security Appeals Council.  (R. at 12.)  The Council denied the
request for review via a letter date-stamped June 30, 2005.  (R.

---

[1] The instant appeal contests only the denial of Disability Insurance
Benefits to Rosen for the period spanning May 13, 2002, to August 19, 2004.
Rosen was deemed disabled and granted benefits as of September 1, 2004.

at 4.)

During the time period following ALJ Pianin's determination and prior to the denial of the request for review by the Appeals Council, Rosen sought to introduce additional medical evidence into the record, specifically a report of clinical neuropsychologist Dr. M. Chris Wolf. (See R. at 7, 8; Pl. Stmt. at 2.)  It is unclear from the record whether or not the Appeals Council granted the extension requested by Rosen's counsel for Dr. Wolf's report to be entered into the record.[2]  Plaintiff argues that the "thorough testing" performed by Dr. Wolf "was apparently not available until recently."[3]  (Pl. Br. at 18.)

Rosen filed a second application for Disability Insurance Benefits based on Dr. Wolf's report. (Pl. Stmt. at 2; Pl. Ltr.

_____

[2] Federal courts lack the authority to reconsider a denial of review by the Social Security Appeals Council. *Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001).  Also, evidence not before the ALJ during the proceeding may *not* be considered in the context of a District Court's substantial evidence review of a residual functional capacity determination. *Id.*  This Court may remand a Social Security case to an ALJ for further proceedings to consider evidence not presented at the initial administrative hearing upon a proper showing. *See infra* Pt. IV-B.

[3] Dr. Wolf administered twenty different assessments to Rosen. (See Wolf Rep. at 7.)  The tests included: "Wechsler Adult Intelligence Scale III; Wide Range Achievement Test-Third Edition; IVA+Plus Continuous Performance Test; Delis-Kaplan Executive Function System; Wisconsin Card Sorting Test; Stroop Color Word Test; Test of Memory Malingering; Wechsler Memory Scale-Third Edition; California Verbal Learning Test-Second Edition; Rey Complex Figure Test; Boston Naming Test; Hooper Visual Organization Test; Bells Test; Line Bisection Test; Grooved Pegboard Test; Finger Tapping Test; Beck Depression Inventory-II; Beck Anxiety Inventory-II; Symptom Checklist-90-R; General Health and History Questionnaire (Family and Patient Versions)[.]" (Wolf Rep. at 7.)  Though not made clear by plaintiff, the correspondence from Rosen's current counsel suggests that Rosen first saw Dr. Wolf in March or April of 2005 — at least six months after the adverse determination by the ALJ.  (See R. at 8.)

dated Jul. 3, 2006.)  His second application was granted and Rosen was deemed disabled as of September 1, 2004.  (Pl. Stmt. at 2; Pl. Ltr. dated Jul. 3, 2006.)

Rosen alleges that ALJ Pianin's assessment of his residual functional capacity ("RFC") was improper, and the Commissioner failed to make a satisfactory showing that Rosen was capable of performing other jobs sufficiently available in the national economy.  (Pl. Br. at 9, 14.)  In addition, Rosen requests this Court to remand his case to the ALJ for additional proceedings to consider the "new evidence" contained in Dr. Wolf's report.  (Pl. Br. at 18.)  Finally, Rosen contends that the record contains sufficient evidence to merit summary judgment in his favor without remand to the ALJ for additional proceedings.  (Pl. Br. at 19-20.)

## II.

Steven Rosen was 52 years old at the time of the hearing before ALJ Pianin.  (R. at 25.)  Rosen has suffered from Crohn's disease[4] since childhood, resulting in a lengthy history of

---

[4] Crohn's disease is "a chronic granulomatous inflammatory disease . . . involving . . . the gastrointestinal tract . . . it frequently leads to intestinal obstruction and fistula and abscess formation and has a high rate of recurrence after treatment."  *Dorland's Illustrated Medical Dictionary* 480 (28th ed. 1994) [hereinafter *Dorland's*].

gastrointestinal problems and procedures.[5]  (See R. at 167-189,
192.)  Despite his disease, Rosen was employed in a management
position in the social services industry during the years prior
to 1996.  (See R. at 54-55, 90.)

In January, 1996, Rosen suffered a "[s]ubarachnoid hemorrage
with anterior communicating aneurysm rupture" ("aneurysm").  (R.
at 153.)  As a result, Rosen has experienced disturbances of
varying severity in his patience, concentration, mood, memory,
and ability to interact peacefully with his family and friends.
(See R. at 20-24.)  One year after the aneurysm, Rosen returned

---

[5] Physicians performed a "total proctocolectomy and ileostomy" on Rosen
in 1975.  (R. at 192.)  A proctocolectomy is "surgical removal of the rectum
and colon."  *Dorland's*, at 1357.  An ileostomy is the "surgical creation of an
opening into the [small intestine] . . . ."  *Id.* at 819.  Due to ulcer
disease, Rosen had a subtotal gastrectomy in 1985.  (R. at 192.)  A subtotal
gastrectomy is "excision of . . . part of the stomach."  *Dorland's*, at 680.
Following that, Rosen had surgeries to treat "perineal problems including
abscesses."  (R. at 192.)  An abscess is "a localized collection of pus buried
in tissues, organs, or confined spaces."  *Dorland's*, at 5.  In 1989, Rosen had
a procedure to repair the perineal fistula and resection a portion of his
small intestine.  (R. at 192.)  A fistula is "an abnormal passage or
communication, usually between two internal organs, or leading from an
internal organ to the surface of the body; frequently designated according to
the organs or parts with which it communicates
. . . ."  *Dorland's*, at 635.  In 2000, Rosen experienced a "recurrence of
peristomal abscess and fistula and enterocutaneous fistula."  (R. at 192.)
This was treated via a surgery entailing "revision of [Rosen's] ileostomy and
resection of an enterocutaneous fistula."  (R. at 192.)  Earlier in 2000, an
erroneous report of an additional cerebral aneurysm corresponded with Rosen
experiencing Crohn's symptoms including "abdominal discomfort, gas pains, and
a change in stomal output associated with fatigue and aphthous changes in the
corners of his mouth."  (R. at 192.)  In September, 2002, Rosen was not
"acutely ill[,]" and "[h]is abdomen was soft and nontender with normal sounds
and was somewhat protuberant with numerous scars."  (R. at 192.)  He was
prescribed Pentasa at that time.  (R. at 192.)  Pentasa is a medication for
ulcerative colitis.  PENTASA (mesalamine) - Effective Medicine for
Ulcerative Colitis, http://www.pentasausa.com (last visited July 28, 2006).
Rosen estimates he has had twenty procedures to address his gastrointestinal
condition during his life.  (R. at 193.)  In 2000, Dr. Mark Gilder of Saint
Barnabas Medical Center reported that Rosen has had at least 23 procedures to
treat his Crohn's disease.  (R. at 187.)

to his previous employer, Jewish Family Services, but was relieved of his management responsibilities.  (See R. at 54-55, 194.)  As a result of continued poor performance, Rosen was forced to resign in October, 1999.  (R. at 55.)  Rosen failed in a number of subsequent attempts to retain skilled employment and has not been employed since May, 2002.  (R. at 39, 55-56.)  Rosen has not pursued unskilled employment.  (R. at 42-43.)

## III.

This Court reviews the decision of the ALJ to determine whether there is substantial evidence on the record to support the ALJ's decision.  *See* 42 U.S.C. § 405(g); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994)).  Any finding of fact made by the ALJ shall be conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate."  *Plummer*, 186 F.3d at 427.  Substantial evidence can also be described as "more than a mere scintilla but may be somewhat less than a preponderance of the evidence[.]" *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).

**IV.**

**A.**

The SSA uses a five-step sequential evaluation process to determine whether an individual is disabled.  20 C.F.R. § 404.1520.  In *Plummer v. Apfel*, the Third Circuit described the five-step evaluation:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. § 1520(a).  If a claimant is found to be engaged in substantial activity, the disability claim will be denied.  *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290-91, 96 L.Ed.2d 119 (1987).  In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  20 C.F.R. § 404.1520(c).  If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  20 C.F.R. § 404.1520(d).  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work.  20 C.F.R. § 404.1520(d).  The claimant bears the burden of demonstrating an inability to return to her past relevant work.  *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  If the claimant is unable to resume her former occupation, the evaluation moves to the final step.
>
> At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability.  20 C.F.R. § 404.1520(f).  The ALJ must show there are other jobs existing in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is

not disabled.  *See* 20 C.F.R. 404.1523.

*Plummer*, 186 F.3d at 428.  If a determination about a claimant's disability can be made at any step in the sequential evaluation, the analysis is concluded without continuing on to any remaining steps.  20 C.F.R. § 404.1520(a)(4).

B.

Sentence six of § 405(g) vests district courts with the authority to remand a Social Security proceeding to the Commissioner for the consideration of new evidence.  Such a remand is permitted "upon a showing that there is new evidence which is material and that there is *good cause* for the failure to incorporate such evidence into the record in a prior proceeding . . . ."  42 U.S.C. § 405(g) (emphasis added).  The Third Circuit has determined that such a remand requires all of the following:

> [T]he evidence must first be "new" and not merely
> cumulative of what is already in the record.  Second,
> the evidence must be "material;" it must be relevant
> and probative.  Beyond that, the materiality standard
> requires that there be a reasonable possibility that
> the new evidence would have changed the outcome of the
> Secretary's determination.  An implicit materiality
> requirement is that the new evidence relate to the time
> period for which benefits were denied, and that it not
> concern evidence of a later-acquired disability or of
> the subsequent deterioration of the previously non-
> disabling condition.  Finally the claimant must
> demonstrate good cause for not having incorporated the
> new evidence into the administrative record.

*Szubak v. Sec'y of Health and Human Services*, 745 F.2d 831, 833
(3d Cir. 1984) (per curiam) (internal citations omitted).

The Circuit has elaborated that "'[g]ood cause' requires the
applicant to articulate a justification for having failed to
present the evidence to the ALJ." *Smith v. Comm'r of Soc. Sec.*,
80 F. App'x 268, 270 (3d Cir. 2003) (per curiam); *see also Cruz-
Santos v. Callahan*, No. Civ.A. 97-439, 1998 WL 175936 at *3
(D.N.J. Apr. 7, 1998) ("[P]arties have been required to provide a
logical reason [as to] why the proffered additional evidence was
not, or could not have been, presented to the Secretary for
inclusion in the record during the administrative proceedings."
(internal quotation omitted)).  The burden rests on the claimant
to make a satisfactory showing of good cause. *Lopacinski v.
Barnhart*, No. CIV.A. 01-4364, 2003 WL 1962302 at *2 (E.D. Pa.
Apr. 21, 2003).

The statutory "good cause" requirement reflects the
legislative intent to achieve judicial efficiency by preventing
Social Security proceedings from being repeatedly remanded to
consider each new piece of evidence. *Cruz-Santos*, 1998 WL 175936
at *3 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991)).
In *Szubak*, the Third Circuit stated that "claimants should
generally be afforded only one fair opportunity to demonstrate
eligibility for benefits under any one set of circumstances."
*Szubak*, 745 F.2d at 834.  The "good cause" requirement thus

9

prevents disability applicants from intentionally withholding evidence in order to challenge an adverse outcome without employing the proper appeals process, thereby "obtaining another bite of the apple[.]" *Id.; see also Matthews v. Apfel*, 239 F.3d 589, 595 (3d Cir. 2001) ("If we were to order remand for each item of new and material evidence, we would open the door for claimants to withhold evidence from the ALJ in order to preserve a reason for remand.").

In considering what constitutes "good cause," prior cases are instructive.  First, claimants who are represented by attorneys during their initial administrative proceeding are placed under a heightened expectation to "exercise reasonable diligence to acquire and present to the Secretary all the evidence that might bear on their . . . claims." *Cruz-Santos*, 1998 WL 175936 at *4.  Also, the mere fact that additional medical documentation is available, even if the reports are satisfactorily new and material, is insufficient to show "good cause." *See Smith*, 80 F. App'x at 270-71.  The Third Circuit determined that petitioners seeking to add results of additional medical studies to the record lack "good cause" for remand when there is "no explanation as to why [the] test could not have been conducted, and the results obtained, in time for the ALJ to consider them." *Id.* at 271.  A claimant can request the ALJ to leave the record open pending additional test results and

10

expressed disfavor towards a claimant who failed to do so.  *See id.*

As described above, the Third Circuit in *Szubak* outlined the concerns mitigating against granting remand for consideration of new evidence.  *See Szubak*, 745 F.2d at 834.   Despite these concerns, however, the Circuit granted remand in that case.  *Id.* In doing so, the Court focused on the fact that the ALJ relied heavily on a report which it termed "ambiguous."  *Id.*  Thus, the additional medical evidence was relevant to an ambiguity that merited further attention.  *See id.*

In this case, even if the report of Dr. Wolf is indeed new and material, Rosen fails to articulate a justification for why the studies conducted by Dr. Wolf could not have been performed prior to the hearing before ALJ Pianin.  Rosen suggests that the testing performed by Dr. Wolf was thorough beyond what was medically available prior to the proceeding.  However, Rosen provides no affidavit or other documentation in support of his contention.  Moreover, he does not indicate which, if any, of the twenty assessments performed by Dr. Wolf represent revised or newly available assessment techniques.[6]  Therefore, Rosen has not

---

[6] In fact, Dr. DeMaio-Feldman's report indicates that a number of the tests administered by Dr. Wolf on dates spanning May 10, 2005, to May 20, 2005, were also conducted by Dr. DeMaio-Feldman on December 30, 1999, and January 5, 2000.  (See R. at 230; Wolf Rep. at 7.)  Tests conducted on both occasions include the Wisconsin Card Sort, Wechsler Memory Scales - III, Grooved Pegboard Test, Stroop Test, Boston Naming Test, Finger Tapping Test, Rey Complex Figure Test, California Verbal Learning Test, and Beck Depression Inventory-II.  (See R. at 230; Wolf Rep. at 7.)

11

"provide[d] a logical reason" why the assessment and report of Dr. Wolf could not have been obtained in time for the initial administrative hearing.

Rosen's counsel did not request that the record remain open pending additional test results. To the contrary, all indications are that Rosen sought the additional testing with Dr. Wolf in response to the adverse result of his August 9, 2004, hearing. Rosen provided an array of medical documentation for consideration at the hearing and was represented by counsel. The established channels of review, including the Social Security Appeals Council and the federal court system, are available to Rosen. Under these circumstances, a remand for new evidence would grant Rosen a second "bite of the apple" which the Third Circuit forbids.

In sum, Rosen has failed to carry his burden to demonstrate good cause pursuant to § 405(g). Therefore, this Court will not remand the matter for consideration of Dr. Wolf's report.

C.

ALJ Pianin determined that Rosen "was not under a 'disability,' as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520)" (R. at 27 ¶ 13.) The ALJ determined that Rosen was capable of performing

12

other work available in the national economy.  (R. at 26, 27 ¶ 12.)

(1)

In the first step, the ALJ found that Rosen "has not engaged in substantial gainful activity since the alleged onset of disability."  (R. at 27 ¶ 2.)  In the second step, the ALJ determined that Rosen had "severe" physical and cognitive limitations, including "status/post cerebrovascular accident, Crohn's disease, and organic mental disorder/depression."[7]  (R. at 19, 27 ¶ 3.)  Rosen does not challenge these determinations.

Nevertheless, ALJ Pianin determined that none of Rosen's conditions met or were medically equal to a listed impairment, "either singly or in combination."  (R. at 19; R. at 27 ¶ 4.) Specifically, ALJ Pianin considered Rosen's aneurysm under Listings 11.04A and 11.04B, his Crohn's disease under Listing 5.07, and his organic mental disorder and depression under Listings 12.02B and 12.04B.  (R. at 19-20) *See* 20 C.F.R. § 404, Subpt. P, App. 1.

The ALJ then proceeded to evaluate Rosen's RFC.  (R. at 20-24.)  In performing this analysis, the ALJ considered the medical reports and the testimony of Rosen and his wife.  (Id.)

---

[7] The ALJ determined Rosen suffered from anemia, but this ailment was non-severe because treatment was expected to relieve the condition within twelve months.  (R. at 19.)

13

Specifically, the ALJ reviewed medical and psychological data provided by neurosurgeon Dr. Robert H. Rosenwasser, neurologist Dr. Stephen J. Hefferen, internist Dr. Diago M. Fiorentino, neuropsychologist Dr. Diane DeMaio-Feldman, gastroenterologist Dr. Zalman R. Schrader, Dr. David Watral,[8] and psychiatrist Dr. Srisai Gowda.  (R. at 21-24.)  The ALJ also relied on the findings of Disability Determination Service psychological consultant Dr. P.A. Spearman.  (R. at 22-23.)  Rosen and his wife testified about how his aneurysm and Crohn's disease have substantially limited his ability to work.  (R. at 20.)

Dr. Spearman evaluated Rosen on February 7, 2003.  (R. at 196.)  Dr. Spearman's report opined that Rosen was moderately or markedly limited in certain areas of functioning.  (See R. at 206, 210, 211.)  Under "Functional Limitations" Dr. Spearman determined that Rosen had moderate "Difficulties in Maintaining Concentration, Persistence, or Pace[.]"  (R. at 206.)  Under the heading "Sustained Concentration and Persistence" Dr. Spearman noted that Rosen was moderately limited in his ability to (1) "maintain attention and concentration for extended periods" and (2) "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances."  (R. at 210.)  Under the heading "Adaptation[,]" Dr. Spearman stated that

---

[8] Dr. Watral's report does not indicate his medical or professional specialty.  (R. at 193-195.)  The ALJ described Dr. Watral as a "consultative examiner."  (R. at 23.)

14

Rosen was moderately limited in his ability to (1) "respond
appropriately to changes in the work setting[;]" (2) "travel in
unfamiliar places or use public transportation[;]" and (3) "set
realistic goals or make plans independently of others."  (R. at
211.)  Based on an examination conducted on November 13, 2002,
Dr. Watral also found that "[Rosen] continues to demonstrate a
marked pattern of difficulties on both intellectual and memory
measures . . . consistent with a mild dementia arising from the
aneurysm and subsequent surgeries."  (R. at 194.)

    Although Dr. Spearman reported that Rosen experienced only
mild limitation of his social functioning, the ALJ determined
that Rosen's social functioning limitations were, in fact,
"moderate."  (R. at 23.)  The ALJ relied on psychiatrist Dr.
Gowda's documentation on August 26, 2003, of Rosen's
"intermittent explosive/mixed mood disorder."  (R. at 23, 260.)
Dr. Gowda also determined Rosen had a Global Assessment of
Functioning ("GAF") score of 60.[9]  (R. at 260.)

    Rosen and his wife each testified to impairments in Rosen's
concentration and temperament due to his aneurysm.  (R. at 39,
41-48, 51-56.)  In response to a question from the ALJ, Rosen
said he does not "have the attention span to do [unskilled
labor]."  (R. at 42.)  Rosen also testified that he lacks the

---

[9] A score of 60 on the GAF scale is "suggestive of moderate impairment."
(R. at 24.)

15

concentration to read for more than 15 or 20 minutes.  (R. at
45.)  Rosen then stated that the heart of his inability to work
is because he cannot "stay on task for a certain amount of time."
(R. at 46.)  Rosen's wife testified that he experiences
significant difficulties in terms of concentration.  (R. at 52-
54.)  Mrs. Rosen asserted that Rosen is sometimes unable to
complete basic household chores.  (R. at 54.)  ALJ Pianin
determined the testimony of Rosen and his wife "is not fully
credible to the extent that it alleges total disability in that
the medical evidence does not indicated [sic] 'marked'
limitations inconsistent with ability to perform unskilled work."
(R. at 25; see R. at 27 ¶ 5.)

    Dr. Schrader, Rosen's gastroenterologist, anticipated that
Rosen would "continue to suffer consequences of his chronic and
sometimes acute, long-term inflammatory bowel disease."  (R. at
192.)  According to Rosen's testimony, he experiences diarrhea
more than once per week.  (R. at 49.)  Rosen also testified that
he does not regard "some pain or diarrhea" as constituting a
"flare-up" of his Crohn's disease.  (See R. at 46.)  Rather,
Rosen described diarrhea more than once per week as the "norm."
(R. at 49.)  Rosen has also indicated that a Crohn's flare-up
entails "excruciating pain and fever."  (R. at 89.)  Rosen's wife
testified that he is sometimes forced to leave when they are "out
somewhere" due to his diarrhea.  (R. at 52.)  The ALJ regarded

16

Rosen's complaints regarding his pain and diarrhea as credible. (R. at 22.)  Nevertheless, the ALJ reasoned that because Rosen had retained employment despite his Crohn's disease in the years prior to his aneurysm, he remained capable of doing so during the contested time period.[10]  (See R. at 22.)

Ultimately, the ALJ determined that Rosen possessed the following RFC:

> lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk and sit 6 hours of an 8-hour workday; push/pull without limitation except as set forth with regard to lifting/carrying; *limited to simple, routine tasks*; no more than occasional contact with co-workers and the general public; and *requires proximity to a restroom*.

(R. at 24, 27 ¶ 6) (emphases added).

In the fourth step, based on the RFC assessment, the ALJ determined that Rosen was unable to perform any of his past relevant work.  (R. at 25, 27 ¶ 7.)  This was the case because the RFC assessment indicated Rosen was capable of only "simple, routine tasks" while Rosen's past relevant work was skilled labor.  (R. at 25.)

In step five, ALJ Pianin found that Rosen retained the ability to complete "a significant range of light work as defined

---

[10] The Court notes, however, that Rosen has been unable to work for significant periods of time due to his Crohn's disease.  (See R. at 84.) According to Rosen, he did not work from 1972 to 1974, 1983, or 2000 due to Crohn's disease.  (R. at 84.)

in 20 CFR § 404.1567." (R. at 25, 27 ¶ 11.) Guided by the testimony of a Vocational Expert ("VE"), the ALJ opined that Rosen "is capable of making a successful adjustment to work that exists in significant numbers in the national economy[.]" (R. at 26, 27 ¶ 12.) ALJ Pianin determined that Rosen could perform such unskilled jobs as office helper, mail clerk, and marking clerk.[11] (R. at 26, 27 ¶ 12.)

The ALJ found that Rosen was capable of performing jobs sufficiently available in the national economy, and thus he failed to satisfy step five of the sequential evaluation. (R. at 26, 27 ¶ 12.) Therefore, ALJ Pianin deemed Rosen "not disabled" and denied him Disability Insurance Benefits for the period spanning May 13, 2002, to August 19, 2004. (See R. at 26, 27 ¶ 13.)

(2)

Rosen maintains that the ALJ's assessment of his RFC is not supported by substantial evidence. For the reasons to follow, this Court agrees. According to Social Security Ruling 96-8p, the RFC should describe a claimant's "ability to do sustained

---

[11] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs." 20 CFR §§ 416.968, 404.1568.

18

work-related physical and mental activities in a work setting on a regular and continuing basis." S.S.R. 96-8p (1996). The Commissioner defines "regular and continuing basis" to mean "8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* The Third Circuit has interpreted the term "moderately limited" in a RFC assessment to mean "that an impairment interferes with the claimant's ability to perform a given task up to one third of the time." *See Schuh v. Barnhart*, 85 F. App'x 854, 856 n.3 (3d Cir. 2004).

There is not substantial evidence in the record supporting the ALJ's conclusion that Rosen is capable of performing even "simple, routine tasks" for 8 hours a day, 5 days a week or an equivalent schedule.[12] Dr. Spearman indicated that Rosen suffered from some moderate functional limitations. As noted above, such moderate limitations mean that Rosen's impairments will interfere with his ability to perform tasks in those areas of functioning for up to one third of each work day. These limitations will be reflected in his job performance particularly in concentration, persistence, pace, attendance, punctuality, adherence to schedule, adaptation to alterations in work environment, and goal setting.

---

[12] This Court recognizes that "[t]he ALJ has the authority to evaluate the credibility of witnesses." *Diaz v. Comm'r of Soc. Sec.*, 89 F. App'x 323, 326 (3d Cir. 2004). However, "if the witness's subjective complaints are substantiated by medical evidence, the ALJ may not conclude that the witness lacks credibility without contradictory medical evidence." *Id.* at 326-27.

19

Dr. Spearman concluded that, "[d]espite some cognitive limitations, [Rosen] seems cpable [sic] of adapting, relating and responding adequately to routine jobs."  (R. at 212.)  He also added that Rosen "can concentrate efficiently, but may lose some efficiency when he is required to sustain focus for long periods."  (R. at 212.)  However, in the same paragraph, Dr. Spearman stated that "[Rosen] is better suited for a job which does not involve sustained periods of concentration."  (R. at 212.)  Dr. Spearman further explained that Rosen "should be able to focus adequately for 2 hour periods."  (R. at 212.)

The consistent theme of medical reports from various medical practitioners, dating back to 1996, was that Rosen experiences difficulties in concentration and memory.  In late 1996, neurosurgeon Dr. Rosenwasser reported that "[Rosen's] residual neurological deficits are a decrease in short term memory, decrease in attention, lack of initiative and alteration in the speed of process of information."  (R. at 165.)  In August, 2002, internist Dr. Fiorentino reported that Rosen experienced continuing cognitive and functional limitations.  (R. at 191.)  Dr. Watral echoed Dr. Fiorentino's observations later in 2002, when Dr. Watral documented Rosen's marked cognitive difficulties.  (See R. at 194.)  In consultations with neurologist Dr. Hefferen during 2002 and 2003, Rosen reported "problems with focus, concentration, memory, [and] executive functioning . . . ."  (R.

at 214, 215, 217, 218.)

Dr. Hefferen prescribed Adderall and Aricept for Rosen's neurological problems.[13]  (See R. at 214, 215, 217.)  Despite these medications, Rosen continued to report cognitive difficulties through the last report by Dr. Hefferen included in the record; that report is dated April 10, 2003.  (R. at 214.)

The lone medical opinion contrary to this trend was authored by Dr. DeMaio-Feldman in September, 2000.  (See R. at 227.)  In that letter, Dr. DeMaio-Feldman stated that Rosen demonstrated average attention, thus representing a significant improvement since just eight months earlier.  (See id.)  However, Dr. DeMaio-Feldman's report was inconsistent with the prior and subsequent opinions of her colleagues.  Therefore, this Court has identified seven years of medical documentation describing Rosen's cognitive deficits.  This lengthy history is not incorporated by ALJ Pianin's definition of Rosen's RFC as requiring limitation to

---

[13] Adderall is prescribed to treat Attention-Deficit/Hyperactivity Disorder ("ADHD").  ADDERALL XR: Treatment for ADHD, http://www.adderallxr.com (last visited August 2, 2006).  ADHD is "a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequent and severe than is typically observed in individuals at a comparable level of development . . . ."  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 78 (4th ed. 1994).  Aricept is primarily prescribed to treat the deterioration of memory and behavior associated with Alzheimer's disease.  Aricept - Official Site, http://www.aricept.com/about/index.aspx (last visited August 2, 2006).
    As of April 8, 2002, Rosen was taking 30 milligrams of Adderall.  (R. at 217.)  On the same date, Dr. Hefferen added Aricept to his prescriptions.  (R. at 217.)  On July 15, 2002, Dr. Hefferen increased Rosen's dosage of Adderall.  (R. at 215.)  On April 10, 2003, Dr. Hefferen again increased Rosen's dosage of Adderall, in response to Rosen's complaint that his prior dosage level was insufficient to treat his concentration problems.  (R. at 214.)

"simple, routine tasks."

(3)

ALJ Pianin incorporated Rosen's symptoms of Crohn's disease into the RFC by including the need for "proximity to a restroom" and limiting Rosen to simple and routine tasks.  The ALJ stated that Rosen's "ongoing diarrhea is adequately accommodated by restriction to a work location with proximity to a restroom, and that the claimant's ongoing digestive pain could interfere with the attention/concentration necessary for skilled work, but does not prevent the more modest level of sustained attention/concentration necessary for simple, routine tasks." (R. at 22.)

The ALJ's conclusion that Rosen's Crohn's-related physical limitations could be accommodated solely by placing him in proximity to a restroom is not supported by substantial evidence. Rosen testified that he experiences diarrhea and pain that are likely to interrupt his workday no less than once per week.  Dr. Schrader stated that Rosen can anticipate experiencing acute symptoms of Crohn's disease at times; those occasions have the potential to cause Rosen significant discomfort, distraction, and absences from work.  Rosen's work history proves that his Crohn's disease has previously resulted in protracted absences from work.

22

Dr. Schrader's projection indicates the potential for similar absences in the future.  Rosen's complaints of frequent pain and diarrhea interspersed with periods of acute Crohn's disease symptoms are uncontradicted in the record.  The availability of a restroom ensures only that Rosen will be able to address his emergent physical needs.  Thus, the ALJ's definition of Rosen's RFC is not supported by substantial evidence because it does not incorporate the other limitations his Crohn's disease imposed on his ability to work, such as the need for frequent absences from work.


                                D.


_____Based on his assessment of Rosen's RFC, the ALJ asked the VE whether there were jobs for a hypothetical person

     of the same age, education, and work background as Mr.
     Rosen capable of light work provided it requires no
     more than simple and routine tasks, would expose the
     individual to at most occasional contact with both
     coworkers and the public.  And finally that was, I
     guess, in an environment where there would be proximity
     to a rest room . . . .

(R. at 57-58.)  The VE responded that employment existed in the national economy to accommodate that work profile.  (R. at 58.) Next, the ALJ inquired whether there were jobs available for someone with "marked deficiencies in concentration, persistence, and pace," in addition to the constraints of the prior

                                23

hypothetical.  (R. at 58.)  To that question, the VE responded that no work was available for such a person.  (R. at 59.)  As described above, the RFC assessment of the ALJ did not properly incorporate Rosen's limitations due to his cognitive or physical conditions.  Therefore, the testimony of the VE does not resolve whether or not employment is available to a person with Rosen's RFC.

The Court concludes that there is not substantial evidence in the record to support ALJ Pianin's definition of Rosen's RFC, nor were the hypothetical questions to the VE adequate to determine if Rosen could perform any jobs present in sufficient numbers in the national economy.[14]

_____

[14] Given the Court's conclusion that the ALJ's definition of Rosen's RFC and the questions to the VE were not supported by substantial evidence, the more prudent path is to remand the matter for further analysis and development of the record, if necessary, rather than to consider entry of judgment for Rosen.

**V.**

‾‾‾‾‾‾For the aforementioned reasons, the Court will reverse the decision of the ALJ and remand this matter for additional proceedings in accordance with this opinion.  Plaintiff's request for Summary Judgment will be denied.  The Court will issue an appropriate order.


Dated: August 3, 2006.

                                   s/Joseph E. Irenas
                                   ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                   JOSEPH E. IRENAS, S.U.S.D.J.